**DONALD W. COOK**, CSB 116666
ATTORNEY AT LAW
3435 Wilshire Blvd., Ste. 2910
Los Angeles, CA 90010
(213) 252-9444 / (213) 252-0091 facsimile
Email: manncooklaw@gmail.com

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

KENJI HOWARD, an individual,

Plaintiff,

vs.

COUNTY OF LOS ANGELES, a municipal corporation; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, a public entity; FORMER DEPUTY SHERIFFS LINDA QUINONEZ, ROBERT M. TAUSON (#089503), WILLIAM A. NEUMANN (#066731), and Does 1 through 10, all sued in their individual capacities,

Defendants.

Case No.

**COMPLAINT FOR DAMAGES**

1. Deprivation of Civil Rights / 42 U.S.C. § 1983

2. *Monell* Claim / 42 U.S.C. § 1983

DEMAND FOR JURY TRIAL

**I. JURISDICTION AND VENUE.**

1. Plaintiff's claims arise under 42 U.S.C. §1983. Accordingly, federal jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

2. Plaintiff's claims arise out of, *inter alia*, acts of personnel employed by the County of Los Angeles, causing injury to Plaintiff in the County of Los Angeles. Accordingly, venue is proper within the Central District of California.

**II. PARTIES.**

3. Plaintiff Kenji Howard, an individual, is 45 years old. He is presently a resident of the County of Los Angeles, City of Los Angeles and as of the date of the wrongful acts alleged herein, he was a resident in the City of Compton.

4. At all times material herein, defendant County of Los Angeles ("LA County") was and is a public entity duly organized under the laws of the State of California, and was responsible for the hiring, training, and supervising of the conduct of its employees and agents of the County, the Los Angeles County Sheriff's Department and its deputies and members.

5. At all times material herein, defendant Los Angeles County Sheriff's Department ("LASD"), is a public entity subject to suit under 42 U.S.C. § 1983 (*Streit v. County of Los Angeles*, 236 F.3d 552, 565-66 (9th Cir. 2001)).

6. Defendants LA County and LASD are "persons" subject to suit within the meaning of Title 42, U.S.C. § 1983 under *Monell v. New York Dept. of Social Serv.*, 436 U.S. 658, 691 (1978). Collectively, these two defendants are referred to as "Entity defendants."

7. At all times material herein, Entity defendants were responsible for the employment, training, and supervision of the actions, conduct, policies, practices, and customs of the employees and agents of the LA County, including LASD and all of its deputies and members. At all times material herein, Entity defendants were responsible for assuring that the actions, conduct, policies, procedures, and customs of the LASD complied with the laws and the Constitutions of the United States and of the State of

California.

8. Plaintiff is informed and believes and based thereon alleges that defendants Linda Quinonez ("Quinonez"), Robert M. Tauson (#089503) ("Tauson") and William A. Neumann (#066731) ("Neumann"), are retired LASD Deputies. At the time of the wrongful acts complained herein, they were employed by the LASD as deputy sheriffs – Quinonez as a polygraphist while Tauson and Neumann were homicide investigators. All were acting within the course and scope of their employment as LASD employees. Collectively, these defendants are referred to as "Deputy defendants."

9. The true names of defendants DOES 1 through 10, inclusive, are not now known to Plaintiff who therefore sues these Defendants by fictitious names. Upon ascertaining the true name of a DOE Defendant, Plaintiff will amend this complaint, or seek leave to do so, by substituting same for the fictitious name. Plaintiff is informed and believes, and based thereon alleges, that each DOE Defendant is in some manner responsible for the injuries and damages herein complained of.

10. At all times material herein, defendants were each acting as the employee, agent representative, and officer of every other defendant herein, and within the course and scope of such employment and agency. All defendants were acting under color of state law.

***Tolling***

11. On October 17, 1997, in *People v. Kenji Howard*, Los Angeles Superior Court No. YA02686521, Plaintiff was convicted of one count of first degree murder; three counts of attempted murder; and one count of shooting at an occupied vehicle. On November 7, 1997, the superior court sentenced Plaintiff to a prison term of 35 years to life, plus 10 years for a firearm enhancement. By order filed July 16, 2021, the superior court granted Plaintiff's habeas corpus petition and ordered a new trial. See **Exhibit A**. Thereafter, the prosecution transferred the criminal case against Plaintiff to juvenile court for proceedings on a juvenile petition for charges arising from the charges originally filed in No. YA02686521. The prosecution ultimately elected not to retry Plaintiff in juvenile

court and thus, by order filed May 26, 2022, the superior court dismissed the juvenile petition. See **Exhibit B**.

## III. FACTS COMMON TO ALL CLAIMS.

12. On March 17, 1995, from inside a 1977 Oldsmobile Cutlass, a two door passenger vehicle, a shooter shot at another vehicle, a 1977 Chevrolet Concours. Multiple rounds from a 9mm handgun struck two passengers inside the Chevrolet Concours. One passenger, Arkett Mejia, was killed; another passenger, Travon Johnson, was seriously injured. Based on a LASD investigation conducted by defendants Quinonez, Tauson and Neumann, Plaintiff, who was charged as an adult, was convicted of and sentenced on homicide charges arising from the March 17, 1995 shooting. See **Exhibit A**. At the time of the shooting, Plaintiff was age 16 years and approximately nine months.

13. During the course of their 1995-96 investigation, Deputy defendants uncovered substantial evidence that the triggerman and person solely responsible for the shooting was Edward Powell ("Powell"). Plaintiff is informed and believes and based thereon alleges that during the course of their investigation the Deputy defendants learned that as of March 1995, Powell was 24 years of age and a known gang member with a criminal history that included a violent felony. Deputy defendants also learned that in the hours leading up to the shooting, Powell was in possession of the 9mm handgun used in the shooting and was firing rounds into the air.

14. Notwithstanding the foregoing, Plaintiff is informed and believes and based thereon alleges that the Deputy defendants concluded that Plaintiff was the shooter because (a) Plaintiff was in fact in the Oldsmobile Cutlass when the shooting occurred; (b) when LASD recovered the 9mm handgun it was found in Plaintiff's possession and then later determined to be the handgun used in the shooting; and (c) Plaintiff fled out-of-state upon learning he was suspected of having been the shooter.

15. Plaintiff is informed and believes and based thereon alleges that the Deputy defendants believed Powell was the likely shooter but further believed the evidence against him was lacking. Hence, to secure the filing of homicide charges against Powell,

Plaintiff is informed and believes and based thereon alleges the Deputy defendants engaged in a conspiracy to fabricate evidence that implicated Powell by making Plaintiff Powell's accomplice as follows: At Powell's direction, Plaintiff took the handgun from Powell and then shot at the Concours at Powell's behest. To accomplish their objective, defendants, based on information and belief, committed the following overt acts in furtherance of the conspiracy:

A. In the LASD investigation into the shooting, defendant Quinonez interrogated Plaintiff. During that interrogation Quinonez, taking advantage of Plaintiff's youth and immaturity, used interviewing techniques so abusive that she knew or should have known would likely result in a false confession. For instance, Quinonez repeatedly lied to Plaintiff by telling him witnesses were contradicting Plaintiff's statements that Powell fired the rounds when, in fact, no such witnesses had contradicted Plaintiff's statement that Powell was the shooter.

B. Quinonez coerced Plaintiff into stating that he was the shooter and that he shot by holding the firearm in his right hand that was extended *outside* of the Cutlass when the shots were fired. The Deputy defendants though were aware that physical evidence, coupled with the statements by passengers in the Cutlass, indicated the handgun was fired from *inside* the Cutlass. If correct, *i.e.,* the 9mm handgun was fired from inside the Cutlass, that fact exposes Plaintiff's confession as being false. For it was undisputed that Plaintiff was in the rear seat, next to the passenger door, thereby making it highly improbable for Plaintiff to have fired the handgun from *inside* the vehicle.

C. To insure that the physical evidence did not undermine the Deputy defendants' theory that Plaintiff fired rounds from outside the Cutlass and did so at Powell's behest, the Deputy defendants did not disclose to the LASD's firearms' examiner, Deputy Richard Catalani, any of the facts on how the handgun was allegedly fired, whether it was the driver Powell or the rear seat passenger Plaintiff, whether it was fired from inside or outside the Concours, etc. Consequently, in

conducting his examination of the physical evidence, Deputy Catalani limited his analysis to determining if expended rounds were fired from the 9mm handgun found in Plaintiff's possession (they were); the functioning of the handgun; and the location of gunshot residue without any knowledge of the possible significance of his findings to the witnesses' and parties' accounts of the shooting.

D. Furthermore, Plaintiff is informed and believes and based thereon alleges that even though the Deputy defendants knew that the trajectory of the rounds as fired from the Cutlass towards the Concours would likely establish that Plaintiff did *not* fire the rounds, and even though the Deputy defendants knew that when asked, the firearms examiner will prepare a report on bullet trajectories as shown by the physical evidence, Deputy defendants intentionally did *not* ask Deputy Catalani to determine bullet trajectories. Plaintiff is informed and believes and based thereon alleges that the Deputy defendants did not ask for a report on trajectories because they feared, based on their own review of the evidence, that a firearms bullet trajectory report would show the bullets were fired into the Concours in a front to back trajectory. Such a factual finding, the Deputy defendants knew, would be *inconsistent* with Plaintiff being the shooter.

16. Plaintiff is informed and believes and based thereon alleges that it was and is common practice for investigating detectives like the Deputy defendants to request a LASD firearms examiner to compare and contrast the firearm-related evidence the examiner analyzes with witnesses' accounts of a shooting, and an investigating detective's theory on how a shooting occurred. Plaintiff is informed and believes and based thereon alleges that if detectives had informed Deputy Catalani to compare the physical firearms-related evidence to the parties' accounts of the shooting, Deputy Catalani would have prepared a report stating the following conclusions:

A. The gunshot residue Deputy Catalani found inside the Cutlass, was inconsistent with and contradicted Plaintiff's confession that he fired the handgun;

B. Assuming Plaintiff was seated in the rear passenger seat right side as

stated by Plaintiff and the other passengers, Plaintiff could not have fired the rounds because the bullet trajectories into the Concours were level and front to back;

C. The physical evidence – gunshot residue found inside the Cutlass and the bullet trajectories into the Concours – was consistent with the shooter being in the driver's seat, extending his right arm towards the front passenger door and firing the rounds from inside the Cutlass and at the Concours through the Cutlass' open front passenger window.

17. Thus, Plaintiff is informed and believes and based thereon alleges that the Deputy defendants suppressed firearms-related evidence that they believed if revealed would have likely precluded the filing of criminal charges against Plaintiff or at the very least, if charges were filed, the likely result would be Plaintiff's acquittal based on the physical evidence showing he was not the shooter.

18. As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the defendants, Plaintiff has suffered great mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, halm to reputation, and apprehension, which have caused Plaintiff to sustain damages in a sum to be determined at trial, including wrongful imprisonment for over 25 years.

19. Due to defendants' acts, Plaintiff has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish as well as mental and physical pain and injury.

20. As a further result of the conduct of each of these Defendants, Plaintiff has lost past and future earnings in an amount to be determined according to proof at trial.

21. As a further result of the conduct of each of these Defendants, Plaintiff has been deprived of familial relationships, including not being able to get married and raise a family.

22. The aforementioned acts of the Defendants, and each of them, was willful,

wanton, malicious, oppressive, in bad faith and done with reckless disregard or with deliberate indifference to the constitutional rights of the Plaintiff, entitling Plaintiff to exemplary and punitive damages from each defendant other than defendant County of Los Angeles in an amount to be proven at the trial of this matter.

**FIRST CLAIM FOR RELIEF**

Deprivation of Civil Rights via False Evidence

And Suppression of Evidence

(42 U.S.C. § 1983)

(As Against Deputy Defendants and DOES 1-5)

23. The Deputy defendants and DOES, while acting under color of law, deprived Plaintiff of his right to due process of law by both fabricating evidence (the false confession which defendants likely believed was false because of the contradictory physical evidence) and suppressing evidence (intentionally not seeking a firearms examiner's analysis of the physical evidence as contrasted with witnesses' accounts of the shooting and the confession Plaintiff was coerced into giving). Each defendant knew or should have known the prosecution of Plaintiff on the homicide charges was based on evidence that each defendant knew was likely false.

24. As a proximate result of the Deputy defendants and DOES wrongful acts, under 42 U.S.C. § 1983 Plaintiff is entitled to recover compensatory and punitive damages against them in an amount according to proof.

**SECOND CLAIM FOR RELIEF**

*Monell* Claim

(42 U.S.C. § 1983)

(As Against Entity defendants and DOES 6-10)

25. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, the Entity defendants and DOES 6 - 10, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff, engaged in the unconstitutional conduct and omissions as is

specifically elaborated in above, which consist of the following customs and/or policies:

A. The knowing presentation of false evidence by deputies;

B. The deliberately indifferent presentation of false evidence by deputies;

C. The presentation of false evidence by deputies in reckless disregard for the truth or the rights of the accused;

D. Deputies' failure to provide exculpatory evidence to prosecutors;

E. Failing to adequately train, supervise and control its deputies in the investigation and questioning of eyewitnesses, including the prevention of unconstitutional influence of eyewitnesses, and thereby preventing the use of fabricated eyewitness identifications; and

F. Failing to adequately train, supervise and control its deputies to disclose to the District Attorney's Office exculpatory and impeachment evidence, or any other evidence which constitutes *Brady* information.

26. Plaintiff is informed and believes and based thereon alleges that in the years following Plaintiff's conviction and as a result of several petitions for habeas relief, it came to the attention of LASD management that the Deputy defendants had fabricated and suppressed evidence that Plaintiff was the shooter, and that the Deputy defendants had withheld from the LASD firearms examiner Catalani the surrounding circumstances on how the shooting occurred, in order to prevent disclosure of evidence highly favorable to Plaintiff. Notwithstanding such actual knowledge, Plaintiff is informed and believes and based thereon alleges that the LASD management refused to take any corrective actions even when the (now-retired) LASD firearms examiner reported to the County that the physical evidence exonerates Plaintiff of the charges on which he was convicted. Plaintiff is informed and believes and based thereon alleges that LASD's management refusal to take any corrective action was pursuant to the aforementioned long-standing County custom, policy and/or practice, to ignore deputies' fabrication and/or suppression of evidence done in order to secure criminal convictions.

27. As a proximate result of the Entity defendants and DOES wrongful acts, under

42 U.S.C. § 1983 Plaintiff is entitled to recover compensatory damages against them in an amount according to proof.

## PRAYER

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

28. That this Court award Plaintiffs compensatory damages, according to proof;

29. That as against any individual defendant, that Plaintiffs be awarded punitive damages according to proof;

30. That this Court award Plaintiffs attorneys fees and costs incurred in this action under 42 U.S.C. § 1988, and any other appropriate statute;

31. That the Court award costs of suit; and

32. And such other relief as the Court deems appropriate.

DATED: May 24, 2024

**DONALD W. COOK**
Attorney for Plaintiff

By______________________________
Donald W. Cook

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

DATED: May 24, 2024

**DONALD W. COOK**
Attorney for Plaintiff

By____________________________
Donald W. Cook

FILED
Superior Court of California
County of Los Angeles

JUL 16 2021

Sherri R. Carter, Executive Officer/Clerk of Court
By [signature] Deputy
Sheryl R. Humber

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

**CLARA SHORTRIDGE FOLTZ CRIMINAL JUSTICE CENTER**

**CRIMINAL WRITS CENTER**

| | |
|---|---|
| In re<br>KENJI HOWARD,<br>Petitioner,<br>On Habeas Corpus | Case No.: YA026865<br>(Ct. of Appeal Case No.: B301757)<br>(Cal. Supreme Ct. Case No.: S259489)<br><br>MEMORANDUM OF DECISION<br><br>(PETITION FOR WRIT OF HABEAS CORPUS) |

AFTER AN EVIDENTIARY HEARING

Petition for Writ of Habeas Corpus by Kenji A. Howard ("Petitioner"), represented by Carol A. Watson, Esq. Respondent, the People of the State of California, represented by Deputy District Attorney Erika Jerez. Granted.

PROCEDURAL BACKGROUND

On October 10, 1997, a jury found Petitioner guilty of one count of first-degree murder, three counts of attempted murder, and one count of shooting at an occupied vehicle.[1] (Pen. Code,[2] §§ 187, subd. (a); 664/187, subd. (a); 246; § 12101.). The jury also found true that the

[1] This was Petitioner's second trial. At his first trial, which commenced on January 21, 1997, the jury found Petitioner guilty of one count of possession of a firearm by a minor, pursuant to Penal Code section 12101. The jury, however, was deadlocked on all other counts, and the trial court consequently declared a mistrial. (Petitioner's Exh. 21, pp. 6-7.)

[2] All further undesignated statutory references are to the Penal Code unless otherwise specified.

allegations that as to the murder, attempted murder, and shooting at an occupied vehicle counts, Petitioner discharged a firearm at an occupied motor vehicle, and that as to the attempted murder, Petitioner inflicted great bodily injury upon victim Travon Johnson, causing him to become comatose and suffer paralysis. (§§ 12022.6, subd. (b)(1); 12022.7, subd. (b)(2); § 12022.9, subd. (b)(2).) (Petn., at p. 14; Petitioner's Exh. 52.)

On November 7, 1997, the trial court sentenced Petitioner to a term of 25 years to life as to the murder count, plus 10 years for the firearm enhancement. As to the attempted murder counts, Petitioner was sentenced to life imprisonment and as to the special allegations, Petitioner received an additional seven years in state prison. (Petn., at pp. 15-16.) Sentences imposed on the other counts but were either stayed pursuant to section 654, or were to run concurrently. The total aggregate term was 35 years to life, plus life, plus seven years in state prison.

On November 21, 1997, Petitioner filed a Notice of Appeal, alleging that Petitioner was coerced into a confession and that trial counsel was ineffective in providing a full and complete defense in his re-trial by failing to call key witnesses. (Petn., at p. 16.) On June 8, 1999, the Court of Appeal rejected the claims, and affirmed the judgment and sentence. (Petitioner's Exh. 21.)

Four years later, the California Appellate Project intervened with a Motion to Recall Remittitur and Reissue the Opinion to permit the filing of a Petition for Review.[3] (Petitioner's Exh. 22.) On August 26, 2003, the Court of Appeal granted the motion, recalled the remittitur, filed Appellant's Opening Brief, vacated the opinion filed on June 8, 1999, and refiled the same opinion.

On September 26, 2003, Petitioner filed a *pro per* Petition for Review in the California Supreme Court. (Petitioner's Exh. 23.) On October 29, 2003, the California Supreme Court denied review. (Petitioner's Exh. 24.)

---

[3] The basis for this request was that Petitioner's trial counsel had agreed to represent Petitioner throughout the appellate process. However, despite receiving approximately $10,000 from Petitioner's family, counsel failed to file a petition for writ of habeas corpus or a petition for review in the California Supreme Court following the denial of Petitioner's appeal. (Petitioner's Exh. 22, at pp. 4-6.)

On December 13, 2004, Petitioner, through counsel, filed a petition for writ of habeas corpus in the United States District Court for the Central District of California. (Petitioner's Exh. 26.) On March 22, 2005, Petitioner filed a First Amended petition for writ of habeas corpus, asserting that his confession was coerced. (Petitioner's Exh. 25.) On February 23, 2005, Respondent, the Office of the Attorney General, filed a Return to the First Amended Petition for Habeas Corpus. (Petitioner's Exhs. 27-28.) On April 11, 2005, the Magistrate Judge filed the Report and Recommendation, adopting the opinion and conclusions of the 1999 Court of Appeal decision, and denied the petition. The order adopting the Report and Recommendation was entered on July 21, 2005. (Petitioner's Exh. 30.) On September 6, 2005, Petitioner filed a Motion for Certificate of Appealability, which was denied by the Ninth Circuit on January 24, 2006. (Petitioner's Exhs. 31-32.)

On July 26, 2007, Petitioner filed a petition for writ of habeas corpus in the Los Angeles County Superior Court based on newly discovered evidence, namely that Petitioner's codefendant, Edward Powell, had confessed that he was the actual shooter.[4] (Petitioner's Exh. 33.) After briefing, the court denied the petition as untimely and found that the petition presented "no timely new exculpable evidence, and [did] not refute the bulk of the incriminating evidence against the defendant." (Petn., at pp. 18-19; Petitioner's Exhs. 35-37.) On December 4, 2007, Petitioner filed a Motion for Reconsideration in the Los Angeles County Superior Court, in which he argued that the petition was timely and that his claims were not procedurally barred. (Petitioner's Exh. 39.) On December 6, 2007, the court denied the motion, finding "no new facts stated for reconsideration." (Exh. 40, attached to Petn.) On January 11, 2008, Petitioner filed a Notice of Appeal regarding the denied petition and denied motion for reconsideration.[5] (Petitioner's Exh. 41.)

---

[4] Powell was tried on an aider and abettor theory of accomplice liability and was convicted of one count of murder and three counts of attempted murder. (Petn., at p. 15.)

[5] It is unclear what came of this appeal. This court notes, however, that a denial of a petition for writ of habeas corpus is not an appealable order. (See (*Jackson v. Superior Court* (2010) 189 Cal.App.4th 1051, 1064, fn. 5; *In re Clark* (1993) 5 Cal.4th 750, 767, fn. 7.)

On September 1, 2011, Petitioner filed a *pro per* petition for writ of habeas corpus in the Los Angeles County Superior Court, claiming actual innocence based on Powell's signed confession. (Petitioner's Exh. 42.) On September 12, 2011, the court denied the petition. (Petitioner's Exh. 43.) On October 21, 2011, Petitioner filed a *pro per* petition for writ of habeas corpus in the Court of Appeal, which was denied on October 27, 2011. (Petitioner's Exh. 44.)

On September 14, 2018, Petitioner filed a new petition for writ of habeas corpus in the Los Angeles County Superior Court, asserting actual innocence, a coerced confession, unconstitutional waiver of his *Miranda* rights, unconstitutional interrogations, and ineffective assistance of counsel. (Petitioner's Exh. 69.) On August 8, 2019, after briefing, the petition was denied as successive. (Petitioner's Exh. 72.)

On October 25, 2019, Petitioner, through counsel, filed the instant petition for writ of habeas corpus in the Court of Appeal. Petitioner raised the same grounds, in addition to "facts of actual innocence, showing why the petition should not be barred as successive." (Petn. for Review, at p. 14.) On November 26, 2019, the Court of Appeal denied the petition.

On December 6, 2019, Petitioner, through counsel, filed a Petition for Review in the California Supreme Court. Petitioner argued that the courts below improperly failed to consider his actual innocence claims. (Petitioner's Exh. 75.) On December 26, 2019, Respondent filed an Answer, and, on January 6, 2020, Petitioner filed a Reply. (Petitioner's Exhs. 76-77.)

On February 2, 2020, the Petition for Review was granted, and the matter was transferred to the Court of Appeal. The California Supreme Court ordered the Court of Appeal to vacate its summary denial of the October 25, 2019 petition and issue an order to show cause, returnable before the Los Angeles County Superior Court. On February 28, 2020, the Court of Appeal issued the order to show cause why the relief should not be granted "based on newly discovered evidence casting fundamental doubt on the prosecution's case. (See Pen. Code, § 1473, subds. (a) & (b); see, e.g., Petn., Exhs. 1 & 34.)." (Petitioner's Exhs. 78-79.) On April 27, 2020, Respondent filed a Return, and, on May 19, 2020, Petitioner filed a Traverse.

On March 17, 2021, March 18, 2021, and March 24, 2021, this court held an evidentiary hearing. All pleadings and exhibits were received into evidence. On April 29, 2021, the parties presented argument and the matter was taken under submission.

FACTUAL SUMMARY[6]

Sometime in March 1995, Petitioner's co-defendant Edward Powell received a gun in exchange for cocaine. Powell and Petitioner, who was 16 years old at the time, were both members[7] of the "Blood" Limehood Piru street gang.

On the evening of March 17, 1995, Powell drove to Dockweiler Beach in his 1977 Oldsmobile Cutlass. Also in the vehicle were LaKeyna Martin, Anthony Munoz, Sheletha Taylor, and Petitioner. While at the beach, Powell shot at several airplanes landing at or departing from Los Angeles International Airport. Two other couples, Landon Martinez, Gail Lewis, Travon Johnson, and Arkett Mejia, were also at the beach, arriving in a different car. (Petn., at p. 12.)

At approximately 10:00 p.m., police officers arrived at the beach and ordered everyone to leave. While walking back to his car, Martinez heard a voice inside Powell's Cutlass say, "give me the strap," which he interpreted to mean that someone was asking for a gun. (*Howard*, attached to Petn., dated Oct. 25, 2019, as Exh. 21.) Powell drove away with Martin in the front passenger seat, Munoz in the rear driver's side seat, Taylor in the rear middle seat, and Petitioner in the rear passenger seat. (Petn., p. 12.) Martinez drove away with Lewis in the front passenger seat, and Johnson and Mejia in the backseat.

As Powell entered the 105 freeway on-ramp, he saw Martinez's car ahead of them. Powell pulled up next to Martinez's car. Martin and Powell flashed gang signs directed at Martinez's car. Someone from inside the Cutlass then fired approximately 10 shots at Martinez and his passengers. Mejia was killed and Johnson was paralyzed from the neck down as a result

---

[6] The following facts and procedural history are adopted from the petition and the Court of Appeal opinion, *People v. Howard* (Jun. 8, 1999, case no. B118552) [nonpub. opn.] ("*Howard*").)

[7] It is unclear whether Petitioner was a member of the gang or whether he just associated with members of the gang.

of the gunshot wounds he sustained. Powell then drove back to the neighborhood, and gave Petitioner the gun to hold onto. (Petn., at pp. 12-13; Petitioner's Exh. 21, at p. 2.)

The following day, on March 18, 1995, Petitioner was returning the gun to Powell when Los Angeles County Sheriff's Department ("LASD") deputies apprehended Petitioner for possession of the gun. Petitioner was released that day. On March 27, 1995, LASD detectives received a "We Tip" report identifying Powell as the shooter in the March 17th incident. The tip also mentioned Petitioner, and claimed that the Limehood Piru gang was involved in the shooting. When LASD officers tested the gun that they had confiscated from Petitioner, they discovered that it was the murder weapon. (Petn., at p. 13; Petitioner's Exh. 21, at p. 3.)

## I. Pre-Conviction Proceedings and Testimony

### a. Petitioner's First Interview and Statements to Law Enforcement

On March 27, 1995, Petitioner was brought in for questioning. After waiving his *Miranda*[8] rights, Petitioner told detectives that he was in the back seat of the Cutlass when the shooting occurred; that he was sleeping off the effects of marijuana and alcohol, and woke up when he heard gunshots; and that he saw Powell "firing seven or eight shots through the open front passenger window at a car next to them." (Petitioner's Exh. 21, at p. 3; Petn., at p. 32.) Petitioner also falsely claimed that he had bought the gun from Powell the day after the shooting. Petitioner was released after promising to return the next day;[9] however, he fled to Seattle and was not apprehended until May 2, 1995. (Petitioner's Exh. 21, at p. 3; Petn., at p. 33.)

### b. Petitioner's Second Interview and Confession

On May 10, 1995, Petitioner was interviewed a second time. After again waiving his *Miranda* rights, he agreed to take a polygraph test. The test lasted for approximately 3 hours and 15 minutes. When the test was completed, polygraph operator and Deputy Sheriff Linda Quinonez told Petitioner that he had failed the examination. Petitioner consistently denied being the shooter and maintained that Powell was the shooter.

---

[8] *Miranda v. Arizona* (1966) 384 U.S. 436.

[9] Powell was also arrested on March 27, 1995. Officers impounded Powell's vehicle and noted that the rear windows did not roll down. (Petn., at p. 32.) Unlike Petitioner, however, Powell was not released from custody following his arrest.

After three hours of interrogation, Petitioner finally told Quinonez that Powell made him shoot the gun, stating that he "had not meant to hurt anyone, had not paid attention to where exactly he was 'capping' the rounds and had just shot out the window; [and] didn't find out until a couple of days later that he had actually killed someone." (Petn., at pp. 33-34; Petitioner's Exh. 21, at pp. 4-5.) In Petitioner's confession, he explained, "he rested his wrist on the top of the open window in the door, he pointed the gun downward, and he fired several shots." (RT, dated Mar. 17, 2021, at p. 26; Petn., at p. 39.)

Following his confession, Petitioner spoke with LASD investigators Neumann and Tauson and again admitted to the shooting. He explained that Powell handed him the gun and threatened to hurt him if he did not shoot at Martinez's car. (Petitioner's Exh. 21, at p. 6.) Other than this confession, no one has identified Petitioner as the shooter; in fact, numerous witnesses, including Powell himself, have identified Powell as the shooter. (Petn., at p. 14.)

## II. Trial Testimony

### a. Petitioner's Trial Testimony

At trial, Petitioner testified in his own defense. Petitioner stated that he dozed off when the car entered the freeway, that he was awakened by gunshots, and that he saw Powell "reach over Martin, who was bent forward in the front passenger seat, and shoot through the open front passenger window. Powell's gun was completely inside the car." (Petn., at pp. 34-35; Petitioner's Exh. 56, at pp. 3083-3084.) Petitioner testified that Powell fired six to nine shots, and stated that shells were "popping all over the inside of the car." (Petn., at p. 35; Petitioner's Exh. 56, at pp. 3055, 3085.)

### b. Richard Catalani's Trial Testimony

Richard Catalani was the LASD firearms examiner who examined both vehicles involved in the shooting in 1995. (RT, dated Mar. 17, 2021, at p. 17.) He testified for the People at Petitioner's trials. "At the time [Catalani] performed the requested scientific tests and testified in the three trials, he had no knowledge of the facts as to guilt or innocence or the claims of the parties, [including Petitioner's confession]." (Petn., at p. 39; RT, dated Mar. 17, 2021, at p. 24.)

Catalani testified that gunshot residue ("GSR") was found "on the inside of Powell's passenger door," and that GSR was consistent with the gun being fired inside the car. (Petn., at p. 31.)

Catalani also examined the vehicles in order to discern the trajectory of the bullets. Catalani generally observed the bullet holes and concluded that they went into the victim's car "front to back."[10] (RT, dated Mar. 17, 2021, at p. 84.) Catalani did not prepare any reports about the trajectory of the bullets in anticipation of trial, nor did he use any additional materials such as string, laser pointers, or protractors to aid in determining the trajectory of the bullets. (RT, dated Mar. 17, 2021, at pp. 28, 45.) However, Catalani explained that one need not use a protractor or trigonometric measurement in order to determine that the bullets went into the victim's car front to back. (RT, dated Mar. 17, 2021, at p. 84.)

**III. Post-Conviction Proceedings and Testimony**

**a. Eric Lessard's 2021 Examination on Commission**

On December 4, 2006, Eric Vincent Lessard, a licensed private investigator, interviewed Powell at Kern Valley State Prison, located in Delano, California. (Reporter's Transcript ("RT"), dated Jan. 25, 2021, at p. 6, attached as Petitioner's Exh. 3.) During the interview, Powell admitted that he was the shooter, that he handed the gun off to Petitioner after the shooting, and that Petitioner was innocent. (Petn., at p. 44; Petitioner's Exh. 3, at pp. 8-9.)

In anticipation of the evidentiary hearing, on January 25, 2021, Lessard was examined on commission in Gainesville, Florida regarding Powell's confession and declaration. Lessard explained that after the interview, he prepared a handwritten declaration based on Powell's statements. According to Lessard, "sentence by sentence I wrote out the statements he had told me and read that to him, and he would approve/disapprove, [and] make a change. We did that sentence by sentence until the entire declaration was written out. And then I read the entire thing to him again, and he approved, and he signed it." (Petitioner's Exh. 3, at pp. 14-15.)

///

///

[10] By "front to back," Catalani means "the exterior bullet hole was farther forward than the interior exit from the door." (RT, dated Mar. 17, 2021, at p. 30.)

**b. Powell's 2006 Confession to Badia Hill**

In 2006, Badia Hill, a woman who grew up in the same neighborhood as Petitioner and Powell, began communicating with Powell while he was in prison. (RT, dated Mar. 24, 2021, at p. 162.) Powell admitted to Hill that he was the shooter, that Petitioner was innocent, and that he handed the gun off to Petitioner when they returned to the neighborhood. (Petn., at p. 44.)

**c. Powell's 2006 Confession to Eric Lessard**

As stated, *ante*, during the December 4, 2006 interview with Lessard, Powell admitted that he was the shooter, that he handed the gun off to Petitioner after the shooting, and that Petitioner was innocent. (Petn., at p. 44; Petitioner's Exh. 3, at pp. 8-9.) In his declaration, Powell explained the following: on March 14, 1995, his friend came to his home to purchase crack cocaine. She did not have any money to pay for the drugs, so she offered him a 9 millimeter handgun as collateral. Once Powell gave her the cocaine, they agreed that she would return in a few days with the money and at that point he would return her gun. (Petitioner's Exh. 4, at p. 1.) Three days later, on March 17, 1995, Powell drove his friends[11] to the beach his 1977 Oldsmobile Cutlass.

The group arrived at the beach at around 10:00 pm and stayed for about one hour. At the beach, they had a "verbal confrontation … with a large group of what appeared to be Mexicans." (Petitioner's Exh. 4, at p. 2.) Powell admitted that he had the gun tucked into his waistband, concealed completely by his shirt. Powell stated, "up to that time, I had never drawn or exposed the gun that evening. I had never mentioned the gun, and no one I was with knew I had it. There is no way that Kenji Howard could have known that I had a gun." (*Ibid.*) Before the confrontation escalated, the police arrived and "announced on the loudspeaker that the beach was closed, and that everyone had 5 minutes to leave the beach, or their cars would be impounded." (*Id.*, at p. 3.)

Thereafter, Powell drove off in his car with LaKeyna Martin "in the front passenger seat, Kenji in the right back seat, Lakina's [*sic*] cousin [Sheletha Taylor] in the middle of the back

---

[11] According to Powell, the people in the vehicle included Anthony Munos, LaKeyna Martin, and Martin's cousin, Sheletha Taylor. Powell was uncertain whether Petitioner was in the car on the trip to the beach. (*Id.*, at p. 2.)

EXHIBIT A

seat, and Anthony Munos directly behind me." (Petitioner's Exh. 4, at p. 3.) It took approximately 10 minutes to get out of the parking lot and to reach the freeway onramp. Powell indicated that he had been drinking alcohol and smoking marijuana that evening, but that he had not personally seen Kenji smoke or drink that evening.

Powell stated that when he entered the 105 freeway heading eastbound, he looked back and saw "Kenji asleep in the back seat. It was roughly 11:00 p.m." (Petitioner's Exh. 4, at p. 3.) According to Powell, about 10 minutes after they had gotten on the freeway, "we saw a car driving in the right-hand lane. Lakina [*sic*] told me that the people inside [that car] had offended some women from our group at the beach when they went to the bathroom. I slowed my car to get side-by-side with that car. Lakina [*sic*] and I displayed Piru Blood gang signs at the people in that car." (*Id.*, at pp. 3-4.) Powell explained that his car had "2 doors and only 2 windows that roll down. The back seat had only a small, rectangular window that does not roll down." (*Id.*, at p. 4.)

When the members of the other car did not react to Powell and Lakeyna's overtures, LaKeyna and Powell again displayed gang signs, and there still was no response. At this point, Powell "told Lakina [*sic*] to bend down low, and she did so. I removed the gun from my waistband, pointed it with my right hand out the passenger window, and fired approximately 4 shots at the other car." (Petitioner's Exh. 4, at p. 4.) Powell then admitted that he "waited a second or two, then fired 3-4 more shots. Then I accelerated, sped off, and drove back to Compton Blvd. By the time we arrived at the apartments, Kenji had dozed off again." (*Id.*, at pp. 4-5.)

Regarding the time leading up to and during the actual shooting, Powell stated that Petitioner "was asleep in my back seat when I did the shooting … where there are no windows that can go up or down. I am 100% positive that he did not and could not have shot a gun from where he was sitting." (Petitioner's Exh. 3, at pp. 5-6.) Powell continued, "Kenji was not involved in any way in the shooting, nor was he involved in the gang sign throwing that preceeded [*sic*] the shooting. Kenji was asleep, at least until the shooting started, and the shooting ended a few seconds after it began." (*Id.*, at p. 6.)

**EXHIBIT A**

When they returned to their neighborhood, Powell handed the gun to Kenji "and told him to put it in the apartment where he stayed. At that point I still did not know anyone had been shot." (Petitioner's Exh. 4, at p. 5.) A few days later, Powell went to Petitioner's apartment to get the gun and told Petitioner to bring the gun down to him. When Petitioner was returning with the gun, police officers showed up.[12] When Petitioner, who still had the gun in his possession, and Powell saw the police, they both ran. (*Ibid.*)

Powell later learned that his charges had been amended to aiding and abetting a murder "because Kenji had confessed to being the actual shooter. I was surprised to hear this, because I was the only shooter and Kenji was not included in any way." (Petitioner's Exh. 3, at pp. 6-7.)

Powell stated, "I was angry at Kenji for years after. His confession made it easier for me to be convicted. My only thought was that his talking got me in trouble." (Petitioner's Exh. 3, at p. 7.) However, "more than 10 years have gone by, my feelings have changed. … Kenji does not deserve to be in prison for this. I am responsible for this whole situation. Kenji is only responsible for confessing to something he did not do." (*Ibid.*)

According to Lessard, Powell waited 12 years to come forward with his statements because "in his heart he had been blaming Kenji for his own – Powell's own conviction because Kenji had, I believe, spoken freely and carelessly to law enforcement, and Powell told me that he thought that's why he, Powell, had wound up getting in trouble." (Petitioner's Exh. 3, at p. 21.)

Edward Powell also authored a typewritten declaration on June 5, 2007. (Edward Powell Declaration, dated Jun. 5, 2007, attached as Petitioner's Exh. 5.) Lessard denied helping Powell author the June 5, 2007 declaration. (Exh. 3, at pp. 20-21.)

**d. Catalani's Post-Conviction Testimony and Conclusions**

Following Powell's confession, Petitioner's counsel reached out to Catalani while preparing to file the instant petition. (RT, dated Mar. 17, 2021, at p. 25.) For the first time, Catalani reviewed Petitioner's police interview, polygraph examination, and confession. (*Ibid.*) He then reviewed the reports that he authored prior to Petitioner's trial. Catalani concluded that

[12] Powell explained that the area in which the apartment was located is a known drug area, and it is common for police to detain and question individuals.

the GSR that he found in Powell's car could not have been deposited in the manner in which Petitioner confessed. In other words, Petitioner's confession contradicted the GSR evidence. Catalani explained, "to deposit the GSR on the inside of the passenger door, a person 'would have to hold the muzzle of the gun in roughly the same position as the driver shooter, that is, approximately twelve inches away and roughly perpendicular to the door.'" (Petn., at p. 39.) Catalani elaborated, "it would be impossible for a shooter, positioned anywhere inside the vehicle, holding the gun outside the vehicle, to deposit the GSR." (*Ibid.*) Catalani concluded that the placement of the GSR "inside the vehicle would be impossible according to Petitioner's confession, *i.e.*, he put the gun out the window, rested his wrist on the edge of the open window and fired in a downward direction." (*Ibid.*)

Furthermore, Catalani reviewed both his trial testimony regarding the bullet trajectory and photographs of the victim's vehicle. (RT, dated Mar. 17, 2021, at pp. 29, 47-48; Petitioner's Exh. 12.) Catalani now opines that, assuming Petitioner was sitting in the right rear seat with two people to his left, and assuming he is right-handed,[13] "Petitioner could not have fired that shot because the bullet holes went from front to back and level." (Petn., at p. 40.)

**Catalani's Evidentiary Hearing Testimony**

Catalani testified at the evidentiary hearing on March 17, 2021, and explained that GSR "is comprised of several components of gun powder, burned gun powder, particulate lead from bullets, and lead smoke from various sources including the base of a lead bullet that may be vaporizing." (RT, dated Mar. 17, 2021, at p. 18.) It is expelled from a firearm "in the shape of a cone starting with the size of the muzzle of the firearm, and it expands out in a cone shape until it either dissipates or is deposited." (*Id.*, at pp. 18-19.) The lead residue is not visible to the naked eye. (*Id.*, at p. 22.) Furthermore, guns distribute the GSR within an arm's length from the muzzle of the gun, but that the distance between the muzzle of a gun and the GSR is specific "to the particular firearm and ammunition that are being used." (*Id.*, at p. 23.)

Catalani also described exactly how he inspected Powell's vehicle and tested for GSR inside of the car. He explained that he took one filter paper, dabbed it from one end of the door

[13] Badia Hill testified that Petitioner is right-handed. (RT, dated Mar. 24, 2021, at p. 160.)

in a one-inch section, tested it, noted whether the test results came back positive for GSR,[14] and then moved along the door. (RT, dated Mar. 17, 2021, at pp. 60-61; Petitioner's Exh. 10.) Catalani found GSR "on the inside of Powell's passenger door." (Petn., at p. 31.) Specifically, GSR was found "along the mid-section of [the right passenger door] along the top of it from front to back … generally towards the center." (RT, dated Mar. 17, 2021, at p. 21; Petitioner's Exh. 10.) Catalani tested each spot individually, and when he found a spot that was positive, he went back and retested it to confirm that it was positive. (RT, dated Mar. 17, 2021, at p. 61; Petitioner's Exh. 10.)

Catalani reiterated that Petitioner's confession is inconsistent with the GSR that he found in Powell's vehicle. Catalani explained, "if the gun were indeed placed outside of the car [in the way Petitioner confessed] and even if it was going as slow as 40 miles an hour, that's a 40 mile an hour wind that's blowing that smoke away from the area that I found positive for lead smoke." (RT, dated Mar. 17, 2021, at p. 26.) Catalani testified that in order for the GSR he observed and Petitioner's confession to not contradict, the GSR "would have had to have performed, in my opinion, an impossible mission of first coming back into the car and second not depositing right where he held his wrist or right there where the gun was." (*Id.*, at p. 27.) Catalani concluded, "I can't really picture a manner in which he described holding the gun outside and pointed down leaving gunshot residue on the inside of that door at all." (*Id.*, at p. 36.)

Catalani further testified that there was nothing on the frame of the right passenger door "that would suggest that there was any gunshot residue on the frame." (RT, dated Mar. 17, 2021, at p. 57.) Additionally, Catalani noted that the GSR was relatively uniformly distributed across the passenger door, and that "there were no standout spots that were more dense [*sic*], a lot more dense than others." (*Id.*, at p. 85.)

---

[14] Specifically, Catalani explained that in this test he had "three reagents. The first is 15 percent acidic acid … that's the solution that dissolves a little bit of the test material of the lead smoke, and it transfers to the filter paper. Then you add a drop of sodium rhodizonate which causes a pretty bright pink color, and then the confirmation is you add 5 percent solution of hydrochloric acid, one drop of each in sequence for each test." (RT, dated Mar. 17, 2021, at pp. 61-62.) Catalani then recorded the color change. (*Id.*, at p. 62.) Catalani continued, "if the edge of that door was closer to the gun, you'd expect to get more of the lead smoke on it and you'd get a brighter test." (*Id.*, at p. 63.)

Ultimately, Catalani concluded that, "in order for a backseat shooter to hold the firearm in the similar position to a driver shooter would be awkward, if not impossible." (RT, dated Mar. 17, 2021, at p. 78.) Catalani posited that if Petitioner were able to deposit the GSR from the backseat, he would have had to have either moved to his left where the two other passengers were seated, "or reach over with a long reach perhaps to get that gun in the same position either stand up over them, slide them over, again reach pretty far into the front in order to maintain that gunshot residue." (*Id.*, at p. 86.)

**e. Robert Keil's Evidentiary Hearing Testimony**

The People called Robert Keil, the Supervisor of the Firearms Identification Section of the LASD Scientific Services Bureau. (RT, dated Mar. 18, 2021, at p. 97.) Keil took issue with Catalani's method of testing the GSR, but ultimately concluded that there was no basis to eliminate the rear passenger as the shooter. He did state, however, that the GSR is also consistent with the driver being the shooter. (*Id.*, at pp. 121-122.)

The People argued that the front to back trajectory of the bullets "could be accounted for if the shooter's vehicle was stationed ahead of the victim's vehicle at the time the shots were fired." (RT, dated Mar. 17, 2021, at p. 83.) Regarding the bullet trajectory, Keil admitted, "from what I can tell in the photo, it does seem to be a slight front to rear path." (RT, dated Mar. 18, 2021, at p. 106.) After viewing the photograph of the victim's vehicle, Keil acknowledged that the entry point of the bullet was "roughly parallel to the door handle." (*Id.*, at p. 126.) However, Keil stated that there would be other aspects he would need to analyze in order to make that determination, such as whether the bullet "hit any structure, deflected, and then caused additional damage or exited." (*Id.*, at pp. 106-107.)

**f. Badia Hill's Evidentiary Hearing Testimony**

Petitioner called Badia Hill at the evidentiary hearing. Hill explained that she knew both Powell and Petitioner from growing up in the same neighborhood. (RT, dated Mar. 24, 2021, at p. 158.) For purposes of the claims raised by Petitioner, Hill explained that she and Powell began communicating while Powell was incarcerated, and that he said Petitioner was innocent. (*Id.*, at p. 162.) She clarified that she and Powell did not fully discuss the details surrounding the

shooting. (*Id.*, at p. 164.) Rather, she explains that the information she gleaned regarding the shooting came from her communications with Petitioner. (*Id.*, at p. 167.)

## APPLICABLE LEGAL PRINCIPLES

"Habeas corpus will lie to vindicate a claim that newly discovered evidence demonstrates a prisoner is actually innocent." (*In re Hardy* (2007) 41 Cal.4th 977, 1016.) "[A] criminal judgment may be collaterally attacked on habeas corpus on the basis of newly discovered evidence if such evidence casts fundamental doubt on the accuracy and reliability of the proceedings." (*In re Lawley* (2008) 42 Cal.4th 1231, 1239 ("*Lawley*"), internal citations and quotation marks omitted.)

Penal Code section 1473, a new version of which became effective on January 1, 2017, was amended to allow a writ of habeas corpus to be prosecuted on the basis of new evidence. Specifically, section 1473, subdivision (b)(3)(A) states that a writ of habeas corpus may be prosecuted if "[n]ew evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial." (§ 1473, subd. (b)(3)(A).) Section 1473 defines new evidence as "evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative, collateral, or impeaching." (§ 1473, subd. (b)(3)(B).)

## DISCUSSION

### I. Newly Discovered Evidence

This court must first decide whether the evidence Petitioner presents constitutes as "newly discovered evidence" within the confines of section 1473, subdivision (3)(B). The People assert that Powell's confessions do not constitute newly discovered evidence, arguing, "Powell's statements are not new. … this is the fifth time Petitioner has referred to Powell's declaration as the evidentiary support for [a] claim of actual innocence." (RT, dated Apr. 29, 2021, at p. 10.)

The People also claim that Catalani's testimony does not constitute newly discovered evidence. The People argued, "Catalani's augmented opinions are not new. … The information

that he based his opinions on in the hearing was available to both parties at the time of trial." (*Id.*, at pp. 10-11.)

During a status conference held on October 8, 2020, this court held, "the operative order to show cause is the one issued by the Court of Appeal, which says I'm to consider his claim of factual innocence based on newly discovered evidence [and] I believe they're entitled to put on anything the Petitioner thinks is within the ambit of newly discovered evidence showing factual innocence." (RT, dated Oct. 8, 2020, at p. 4.) Indeed, the Court of Appeal's order to show cause directed this court to evaluate why the relief should not be granted based on newly discovered evidence casting fundamental doubt on the prosecution's case and cited Powell's confession as an example of an exhibit upon which this court could rely. Accordingly, this court finds that Powell's confession constitutes newly discovered evidence for purposes of section 1473, subdivision (b)(3)(A).

Regarding Catalani's findings, Catalani explained that he was not provided with Petitioner's confession prior to testifying at his trial. This court finds that Catalani's discovery of Petitioner's confession after trial could not have been discovered prior to trial by the exercise of due diligence: as a prosecution witness tasked with explaining the GSR and bullet trajectory analysis, Catalani would not have been made privy to the details of Petitioner's confession. Furthermore, this court finds that Catalani's testimony is both admissible under the rules of evidence and is neither cumulative nor impeaching. Rather, the combination of Petitioner's confession and Catalani's testimony provides an entirely different version of events than were argued at Petitioner's trial. Accordingly, this court finds that Catalani's testimony constitutes as newly discovered evidence.

**II. Evidence Presented Without Substantial Delay**

Petitioner also must establish that the evidence was presented "without substantial delay." (§ 1473, subd. (b)(3)(A).) Regarding Powell's confession, the People argue that it has been 10 years since his declaration, which constitutes a substantial delay. (RT, dated Apr. 29, 2021, at p. 10.) However, as stated, *ante*, the procedural history of this case indicates that the prior petitions filed based on Powell's confession were erroneously denied as successive. Furthermore,

regarding Catalani's testimony, he did not reevaluate the evidence until after Petitioner's counsel contacted him in anticipation of filing the instant petition in 2018. Therefore, Petitioner has also satisfied this requirement of section 1473.

**III. Evidence of Such Decisive Force and Value**

Here, Petitioner has the burden of proving that, by the preponderance of the evidence, the newly discovered evidence is of "such decisive force and value that it would have more likely than not changed the outcome at trial." (§ 1473, subd. (b)(3)(A).)

**a. Powell's Confession**

The court, having had the opportunity to review Powell's multiple sworn confessions and Lessard's examination on commission, finds Powell's confessions to be credible. Powell explained that he was angry with Petitioner because Petitioner's confession implicated him in the shooting; however, after 10 years, Powell realized that Petitioner "does not deserve to be in prison for … confessing to something he did not do." (Petitioner's Exh. 3, at p. 7.) Furthermore, Powell has little to gain from confessing to being the actual shooter: he is already serving a prison sentence for murder and attempted murder, and was not provided anything in return for this confession.

Additionally, Powell's confession is corroborated by the physical evidence: both firearm examiners during the evidentiary hearing admitted that the position of the GSR did not foreclose the possibility that the driver of the vehicle was the actual shooter. The events leading up to the shooting also indicate that Powell's confession is accurate: Powell confessed that nobody else knew he came to the beach with a gun until he brandished it, and he was the only person who used the gun while at the beach. (Petitioner's Exh. 4, at p. 2.)

Most notably, Powell explains that the window next to Petitioner did not go up or down, and he asserts that he is "100% positive that he did not and could not have shot a gun from where he was sitting." (Petitioner's Exh. 3, at pp. 5-6.) This particular fact was persuasive to this court: in order for Petitioner's confession to be true, Petitioner would have had to lean towards Martin in the front passenger seat, rotate his seat clockwise to a 45 degree angle while jammed in by two other rear passengers, then cock his wrist awkwardly, place his arm outstretched with his

wrist at a right angle resting on the window, and fire a 9 millimeter pistol out the window. The court notes that this position would be all but impossible to accomplish, given the type of firearm and the force of the recoil.

Ultimately, had Powell's confession been available at the time of Petitioner's trial, it would have cast doubt on Petitioner's confession or, at the very least, provided an alternate version of the shooting for the jury to consider. Powell's confession is supported by the evidence adduced at trial. The only piece of evidence that contradicts Powell's confession is Petitioner's own confession. Accordingly, this court finds that Petitioner has met his burden of proving that more likely than not Powell's confession would have changed the outcome at trial.

**b. GSR Evidence**

This court also finds that the GSR evidence supports Petitioner's argument. Catalani concluded that if Petitioner's confession were true and if the vehicle were traveling at a speed of approximately 40 miles per hour, the GSR would have been deposited differently. (RT, dated Mar. 17, 2021, at p. 26.) Furthermore, both experts agreed that the GSR could have been deposited as a result of the gun being held by the driver shooting through the open passenger window. Catalani found that the GSR indicated that the gun was fired approximately "a foot plus or minus from [the front passenger] door." (*Id.*, at p. 24.)

Catalani also found that the lead smoke contradicted Petitioner's confession. As stated, *ante*, Catalani explained that that in order for the lead smoke that he found to have occurred in the manner in which Petitioner confessed, it "would have had to have performed, in my opinion, an impossible mission of first coming back into the car and second not depositing right where he held his wrist or right where the gun was." (RT, dated Mar. 17, 2021, at p. 27.)

Ultimately, Petitioner's confession and the physical evidence do not align. Had Catalani been aware of Petitioner's confession, he would have testified that it would have been "awkward, if not impossible" for Petitioner to have shot the gun and deposited the GSR found on the passenger door frame. Accordingly, this court finds that Petitioner has met his burden of proving that more likely than not that the newly discovered GSR testimony would have changed the outcome at trial.

**DISPOSITION**

For all the foregoing reasons, the petition for writ of habeas corpus is GRANTED. Petitioner's sentence as to all counts is recalled, and the conviction is vacated and set aside. The People have 60 days to re-try or enter into a disposition in this case.

The Clerk is ordered to serve a copy of this order upon Carol A. Watson, Esq., as counsel for Petitioner, and upon Deputy District Attorney Erica Jerez, as counsel for Respondent, the People of the State of California. A courtesy copy is to be served on Supervising Deputy Attorney General Julie Malone, as counsel for Petitioner's custodian, the Secretary of the Department of Corrections and Rehabilitation.

Dated: 7-16-21

WILLIAM C. RYAN
Judge of the Superior Court

JV-596

| ATTORNEY OR PARTY WITHOUT ATTORNEY STATE BAR NO: 80807<br>NAME: C. WATSON<br>FIRM NAME:<br>STREET ADDRESS: 3435 WILSHIRE #2910<br>CITY: LOS ANGELES STATE: CA ZIP CODE: 90010<br>TELEPHONE NO.: 323-290-0310 FAX NO.: Not Available<br>E-MAIL ADDRESS:<br>ATTORNEY FOR (*name*): KENJI AHMAD HOWARD | *FOR COURT USE ONLY*<br><br>FILED<br>Superior Court of California<br>County of Los Angeles<br>MAY 26 2022<br>Sherri R. Carter, Executive Officer/Clerk of Court<br>By [signature] Deputy<br>Lakeya Geisler |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES<br>STREET ADDRESS: 110 REGENT STREET<br>MAILING ADDRESS: DEPARTMENT 242<br>CITY AND ZIP CODE: INGLEWOOD, 90301<br>BRANCH NAME: INGLEWOOD JUVENILE COURT | |
| CASE NAME:<br>PEOPLE V. KENJI AHMAD HOWARD | |
| **DISMISSAL AND SEALING OF RECORDS—<br>WELFARE AND INSTITUTIONS CODE SECTION 786** | CASE NUMBER:<br>YJ40829 |

1. Name of subject child: KENJI AHMAD HOWARD Date of birth: 6-11-1978
2. a. Date of hearing: 05/24/2022 Dept.: 242 Room: 214
   b. Judicial officer *(name)*: JUDGE J. CHRISTOPHER SMITH
3. The court has read and considered the report of the probation officer and any other evidence presented or information provided.

**THE COURT MAKES THE FOLLOWING FINDINGS AND ORDERS:**

4. The child has satisfactorily completed a program of informal supervision, probation under section 725, or a term of probation.
5. The petition(s) filed on *(date(s))*: 8/27/2021 is/are dismissed.
6. The child's juvenile records related to the arrest(s) on *(date(s))*: 8/27/2021 regarding an alleged violation of *(specify offense(s))*: 187(A) PC, 246 PC, 12101(A)1 PC in the custody of this court and of the courts, agencies, and officials listed below are ordered sealed:
   - [X] Probation Dept. *(specify county)*: LOS ANGELES
   - [X] California Dept. of Justice
   - [X] Law enforcement agency *(specify all)*: LLASD-HOMICIDE
     - [X] Law enforcement case number(s): 095000503199011
7. [X] The court finds that sealing the following additional public agency records will promote the successful reentry and rehabilitation of the subject child and orders the records in their custody relating to petitions and arrests listed in items 5 and 6 sealed:
   - [X] District Attorney *(specify county)*: LOS ANGELES
   - [ ] School:
   - [ ] Department of Motor Vehicles:
   - [ ] Other *(specify)*:

   - [ ] Attachment. Number of pages attached: ______________

**Page 1 of 2**

Form Approved for Optional Use
Judicial Council of California
JV-596 [Rev. September 1, 2017]

**DISMISSAL AND SEALING OF RECORDS—
WELFARE AND INSTITUTIONS CODE SECTION 786**

Welfare and Institutions Code, § 786
*www.courts.ca.gov*

**EXHIBIT B**

JV-596

| CHILD'S NAME: PEOPLE V KENJI AHMAD HOWARD | CASE NUMBER<br>YJ40829 |
|---|---|

8. All records pertaining to the dismissed petition are to be destroyed on the dates stated in this item, and the arrest is deemed never to have occurred except that the prosecuting attorney, probation officer, child welfare agency, and court may access these records for the specific purposes stated in Welfare and Institutions Code section 786.

   a. Date court records must be destroyed: 06-11-2016

   b. Date all other records must be destroyed: 05-24-2027

9. The clerk shall send a certified copy of this order to the clerk in each county in which a record is ordered sealed and one copy each to the child, the child's attorney, and the agencies and officials listed in items 6 and 7.

Date: 5/26/22

JUDICIAL OFFICER OF THE SUPERIOR COURT

[SEAL]

**CLERK'S CERTIFICATE**

I certify that the foregoing is a true and correct copy of the original on file in my office.

Date: 5-26-22

Clerk, by ______________________, Deputy

**EXHIBIT B**